UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Criminal No. 22-341 (RWP/HCA)

| | |
|---|---|
| UNITED STATES OF AMERICA, ) <br> ) <br> Plaintiff, ) <br> ) <br> v. ) <br> ) <br> ROBERT PHILIP IVERS, ) <br> ) <br> Defendant. ) | **TRIAL BRIEF OF THE UNITED STATES** |

The United States of America, by and through its attorneys, Andrew M. Luger, United States Attorney for the District of Minnesota, and Andrew R. Winter and Allison K. Ethen, Assistant United States Attorneys, respectfully submits its trial brief in the above-captioned case. This memorandum includes a summary of the facts the government expects the evidence will establish at trial along with briefing addressing the government's motions in limine and other potential evidentiary matters.

## I. Indictment and Elements of the Offense

The defendant, Robert Philip Ivers, is charged with one count of Threatening to Murder a United States Official, a probation officer, in violation of Title 18, United States Code, Section 115(a)(1)(B). There are two elements of the offense, which are: (1) the defendant made a threat to murder a United States Probation Officer; and (2) the defendant did so with the intent to impede, intimidate, and interfere with the Probation Officer while

1

such Probation Officer was engaged in the performance of his official duties, or to retaliate against such Probation Officer on account of the performance of his official duties.[1]

## II. Anticipated Length of Trial

The United States anticipates that the trial, including jury selection and the charge, will require three days.

## III. Background and Anticipated Trial Evidence

Ivers threatened the life of United States District Judge Wilhelmina M. Wright, who presided over a civil lawsuit he filed in the District of Minnesota in 2015. *See Ivers v. CMFG Life Ins. Co.*, No. 15-1577 (WMW-BRT). During the pendency of the civil lawsuit, Ivers frequently erupted into frightening outbursts directed at district court staff and Judge Wright. Dkt. 154 at 145-46.[2] This included sending threatening notes to the court with statements such as, "I do not know where I am fucking sleeping tonight! Think about it!"; "I am sick and tired of this fucking bullshit!"; "I want my fucking money. . . . "; "I will not negotiate!!!"; "Have I made myself clear!!!"; "I am in dire fucking straits!"; and "I am becoming a very dangerous person!!!" *United States v. Ivers*, 967 F.3d 709, 713 (8th Cir. 2020) (summarizing conduct). Ivers persisted in this behavior, despite multiple warnings from the United States Marshals Service to stop. *Id.* at 713-14; Dkt. 154 at 164.[3]

---

[1] Elements based on jury instructions given as to Count 1 during trial of *United States v. Ivers*, No. 18-90 (RWP), Dkt. 135.
[2] The Docket referred to in this Memorandum is citing to the underlying court record from *United States v. Ivers*, 18-90 (RWP) (D. Minn. 2018).
[3] Ivers had been previously convicted in state court of stalking in connection with threats he made against a Minnesota state court judge who had presided over a separate civil action filed by Ivers. Ivers, 967 F.3d at 713. At the time of Ivers's statements towards Judge Wright, Ivers was on probation for that offense. *Id.*

2

Ultimately, Ivers lost the civil lawsuit after a bench trial. *Ivers*, 967 F.3d at 713; Dkt. 152 at 98. Ivers continued to make aggressive statements toward Judge Wright and when visited by two Deputy Marshals seeking to discuss his communications, Ivers refused to retract his statements and instead reiterated that he "possibly could be a walking bomb" and saying of Judge Wright, "that fucking judge—you know if she's scared and she's fearful, it's not my problem. She made her bed." *Id.*

Ivers then refiled the same substantive civil lawsuit he had lost before Judge Wright. *See Ivers v. CMFG Life Ins. Co.*, No. 17-5068 (PJS-DTS). The Court referred Ivers to two pro bono attorneys in Minneapolis. *Ivers*, 967 F.3d at 714; Dkt. 154 at 316-17. During the consultation, Ivers became enraged, screaming things like, "This fucking judge stole my life from me" and "You don't know the 50 different ways I planned to kill her!" *Ivers*, 967 F.3d at 714; Dkt. 154 at 380. Based upon the threats, Ivers was indicted for and convicted of threatening to kill Judge Wright and interstate transmission of a threat. Dkt. 138.

### A. The Court Sentences Ivers to 18-Months' Incarceration with Three Years' Supervised Release

In March 2019, the Court sentenced Ivers to an 18-month sentence of imprisonment followed by three years of supervised release. Dkt. 174 at 2-3. Ivers's conditions of supervised release included a requirement that he participate in mental health treatment/anger management and that he wear a GPS location monitoring bracelet. Dkt. 174 at 5.

Approximately one month prior to his release from prison, Ivers vehemently demanded that he be released to North Dakota. *See* Dkt. 243 at 59 (testifying that he had

"to fight and argue and kick and scream," for permission to live in North Dakota). The United States Probation Office supported the request, reporting that Ivers wished to live with his sister in Fargo, North Dakota. Dkt. 200. The Court granted the request. *Id.*

### B.   Ivers's Conduct During His First Term of Supervised Release

Ivers was released from prison and placed on supervised release in North Dakota in August 2019. Dkt. 200. The United States Probation Office in Minnesota had supervisory authority, and Minnesota assigned probation Officer Jim Weinberger to supervise Ivers. Due to his location, a probation officer in North Dakota also assumed courtesy supervision over the case. Dkt. 251 at 6. During his first meeting with North Dakota Officer Chris Ambuehl, Ivers requested to leave North Dakota. Dkt. 221 at 10-11. Because Ivers had not yet demonstrated an adequate track record of compliance on release, Officer Ambuehl denied the request. Dkt. 243 at 13. The Court agreed with the probation office and twice denied Ivers's requests to relocate to Minnesota. Dkt. 208, 225.[4]

Upon receiving these denials, Ivers lashed out at Officer Ambuehl, leaving a series of angry, violent, and sexually graphic voicemail messages for Officer Ambuehl. This included a series of three voicemails in October 2019, including the following:

> This is Bob. I'm having a fucking breakdown! You've gotta tell Weinberger that you want me out of your fucking state. You want me out, and you want me back in fucking Minneapolis. I can't be in North Dakota anymore. Coming over here on Monday, it's not going to do any good. And I'm telling you right now, I'm telling you right now, t's not going to be pretty! I am so fucking angry, I am so fucking wound up! You have no idea! I don't even know how I'm going to make it through this fucking weekend. I have no

---

[4] Ivers appealed the Court's denial of his request. *United States v. Ivers*, No. 19-3338 (8th Cir. Oct. 22, 2019). Before the appeal was decided, Ivers violated supervised release by travelling to Minnesota. The appeal was accordingly dismissed.

4

> idea how I'm even going to get out of this fucking weekend! You tell him. Let me out of your fucking state! I don't want to be here! I am out of my mind! I don't want to be in North Dakota! Exercise your fucking authority, I don't want to be here!

Dkt. 251, Gov't Ex. 1. When his protestations and filings did not yield the desired result, Ivers left Officer Ambuehl a second set of profane and angry voicemails in January 2020 including the following:

> You tell Minnesota to come and get their fucking guy. I'm sick of it and I don't want to be here anymore. If, if Jim Weinberger's in charge of my fucking probation, I want to be down in that territory. He's giving orders from Minneapolis and you're kissing his ass. What are you some kind of an ass kissin' fucking North Dakota ass kisser? You fucking ass kisser. And you kissing that Minnesota boy's ass? You tell him to come and get his fucking guy.

Dkt. 251, Gov't Ex. 2. Ultimately, Ivers's behavior toward Officer Ambuehl became so abusive and uncontrollable that the North Dakota Probation Office rescinded courtesy supervision. Dkt. 251 at 15. United States Probation Officer Weinberger then assumed full supervision of Ivers. Dkt. 251 at 16.

Attempting to capitalize on this change, Ivers filed a "notice" declaring that he was "no longer under the supervision of the North Dakota Probation Office" and that he intended to travel to Minnesota on February 10, 2020. Dkt. 226. That same day, Officer Weinberger and several fellow officers met with Ivers in Fargo. Dkt. 251 at 16. During an hours-long meeting, they explained to Ivers that he did not have permission to travel to Minnesota and that there was a current district court order denying Ivers's request to come to Minnesota. Dkt. 251 at 22.

5

Despite the officers' attempts to dissuade Ivers, on February 9, 2020, Officer Weinberger received an alert that Ivers's GPS monitoring bracelet was moving toward Minnesota. Dkt. 251 at 28. Officer Weinberger obtained a warrant, and local police arrested Ivers upon his arrival in Minnesota. Dkt. 234.

### C. First Revocation of Ivers's Term Of Supervised Release

As a result of Ivers's conduct, the United States Probation Office filed a petition alleging Ivers violated the terms of his supervised release by: 1) leaving the District of North Dakota without permission, 2) failing to follow his supervising officer's instructions, and 3) failing to cooperate with location monitoring. Dkt. 228. Ivers appeared before the Court for a final revocation hearing in March 2020. Dkt. 244. The Court revoked Ivers's supervised release and imposed a six-month sentence, with 30 months' supervised release to follow. Dkt. 244; Dkt. 246 at 2. The Court further ordered Ivers to reside at a residential re-entry facility in Fargo upon his release from imprisonment, to obtain additional mental health treatment. Dkt. 244. Based on his violent outbursts toward probation, the Court explicitly ordered Ivers not to curse, yell at, threaten, or use sexually explicit language when communicating with the Probation Office. Dkt. 244; Dkt. 246 at 5.

### D. Ivers's Refusal to Follow Conditions of Release During His Second Term of Supervision

Ivers served his six-month sentence and was released on August 10, 2020, to a halfway house in Fargo. Dkt. 301 at 7; Dkt. 246 at 5. On August 11, 2020, Officer Weinberger met with Ivers and again reviewed with him the conditions of his release. Dkt. 301 at 7.

Less than one month into his stay at the Fargo halfway house, Ivers again began exhibiting defiant behavior toward Officer Weinberger. On September 4, 2020, Officer Weinberger called Ivers. Dkt. 282. Ivers refused to speak to Officer Weinberger and did not return Officer Weinberger's call despite being directed to do so. Dkt. 282. Four days later, Officer Weinberger again called Ivers. Dkt. 282. Ivers refused to speak to Officer Weinberger, telling staff at the halfway house that "he no longer had a relationship with his probation officer," and that he would only speak to the judge. Dkt. 301 at 10.

The next day, Ivers again refused to speak to Officer Weinberger. Dkt. 301 at 21. At that point, Officer Weinberger called the halfway house staff, who placed Officer Weinberger on speaker phone in Ivers's room. Dkt. 301 at 21. Officer Weinberger instructed Ivers that he needed to apply for health insurance through the State of North Dakota so that he could pursue mental health treatment and anger management pursuant to the Court's sentencing order. Dkt. 301 at 10; Dkt. 245 (sentencing order). Ivers refused to obtain health insurance, arguing that he was not a resident of North Dakota. Dkt. 301 at 21. When Officer Weinberger reminded Ivers that he had, in fact, been living in North Dakota since 2017, Ivers became angry and yelled, "Fuck you!" at Officer Weinberger. Dkt. 301 at 22.

On September 14, 2020, Ivers was discharged from the halfway house for failing to comply with the rules. Dkt. 301 at 18. After his discharge, Officer Weinberger told Ivers that if he did not return to the residential facility, Ivers would face another violation of supervised release. Dkt. 301 at 19. Officer Weinberger and staff at the facility offered Ivers

7

one more chance to re-enter the program. Dkt. 301 at 19. Ivers again refused, returning instead to Fargo. Dkt. 301 at 20.

### E. Second Revocation Of Ivers's Term Of Supervised Release

Based upon Ivers's conduct, the United States Probation Office filed a petition alleging violation of four supervised release terms: (1) failure to report to Probation and follow Probation's instructions, (2) failure to participate in psychiatric counseling, (3) failure to reside at a residential re-entry facility for 180 days, and (4) failure to maintain appropriate communication with Probation. Dkt. 282. During a contested hearing on the violations, the Court heard and considered the testimony of Officer Weinberger, Ivers, and Ivers's sister. Dkt. 284. The Court sentenced Ivers to six months' imprisonment followed by 24 months of supervised release. Dkt. 301 at 81; Dkt. 287 at 2-3. The Court reinstated the same conditions of release as previously ordered after Ivers's first violation. Dkt. 301 at 88; Dkt. 287 at 3-5. This included a special condition that Ivers reside at a residential re-entry center ("RRC") in Fargo, North Dakota, for 180 days upon his release from custody. Dkt. 287 at 5.

### F. Ivers's Refusal to Follow Conditions of Release During His Third Term of Supervision

On September 7, 2021, Ivers was due to be released from the six-month sentence imposed in the second revocation proceeding. Dkt. 376 at 13-15, 17. On September 1, 2021, a few days before Ivers's release, Officer Weinberger talked on the phone with Ivers. Dkt. 376 at 13-15, 17. Ivers's Bureau of Prisons case manager was also on the call. Dkt. 376 at 13-15, 17.

On the call, Officer Weinberger reviewed with Ivers the condition that the Court had imposed requiring Ivers to reside for 180 days at the RRC in Fargo following his release from custody. Dkt. 13-15. Officer Weinberger told Ivers he was to report to the RRC in Fargo. Dkt. 376 at 17. Officer Weinberger offered, however, that if Ivers intended to comply with the other conditions of his supervised release, he would contact the Court and ask if Ivers could reside at his sister's house rather than the RRC. Dkt. 376 at 14-15. Ivers responded by yelling, "fuck you" at Officer Weinberger. Dkt. 376 at 15-16. Ivers's case manager took the phone and ended the call. Dkt. 376 at 15-16.

On September 7, Ivers was released from custody. Dkt. 376 at 17. Prior to his release, Ivers was fitted with a GPS location monitoring device. Dkt. 376 at 17. Rather than go to the RRC in Fargo upon his release, Ivers went to his sister's house in West Fargo, North Dakota. Dkt. 376 at 17. Ivers arrived in the early morning hours of September 8. Dkt. 376 at 18. Officer Weinberger tried to contact him later that morning via his cell phone, his sister's landline, his sister's cell phone, and by using the ankle bracelet's messaging capability. Dkt. 376 at 18-19. Officer Weinberger could not reach Ivers and left messages asking Ivers to call him back. Dkt. 376 at 19.

At 5:30 a.m. on the following day, Ivers called Officer Weinberger's cell phone and hung up when the Officer answered. Dkt. 376 at 19-20. Seven minutes later, Ivers called the Officer's desk phone instead and left the following message:

> This is Bob Ivers. It's Thursday, September 9th. I just left a message with Judge Pratt, and I'm at my sister's house. I had a heart attack on the train coming back. I'm sick and in bed, and if you need any kind of discussions, you need to talk to my attorney. Don't call me. I can't stand your fucking guts. I hate you. You've done nothing but destroy my life. You're a

9

> miserable rotten person. Don't call here. And if you call my sister one more time, I'm going to file charges against you, and I have attorneys. I'll file. Leave my sister alone. You don't call her, mother fucker. Don't ever call her again, asshole. And if you have anything to do with me, you call up my attorney you piece of fucking garbage. You put me in fucking prison three times. You piece of fucking trash. I did hard fucking time. They had me locked up in a fucking box for six fucking months you piece of trash, in a seven-by-nine foot cell, you piece of fucking garbage. You do that to me again. You do that to me again, and you're going to find out you piece of fucking garbage. I'm fucking sick and dying. I'm supposed to be back home. I need health insurance. You're a piece of fucking --- you're a sorry fucking excuse for a human piece of fucking trash. Fuck you. I want you off my case, you stupid piece of fucking garbage.

Dkt. 376 at 20-21. Officer Weinberger's subsequent efforts to contact Ivers were unsuccessful. Dkt. 376 at 21. Officer Weinberger requested a warrant for Ivers's arrest, which the Court issued. Dkt. 376 at 21. On September 12, Ivers was arrested in North Dakota. Dkt. 376 at 21; *see also United States v, Ivers*, District of North Dakota Case No. 21-mj-381 (ARS).

### G. Third Revocation Of Ivers's Term Of Supervised Release

The Court conducted a final revocation hearing in October 2021. Dkt. 341. The government called Officer Weinberger to testify. Dkt. 376. Ivers also testified on his own behalf, providing a narrative account of his conduct in opposition to the alleged violations. Dkt. 376 at 58-61. Ivers contended that he reported to his sister's house as directed by the BOP, that he maintained communication with Officer Weinberger in a "spirited venting" that was "packed with a lot of information," and that he followed Officer Weinberger's directions. Dkt. 376 at 58-61.

Following the testimony, the Court concluded that Ivers had failed to reside at the RRC as directed, had failed to maintain appropriate communication with Officer

Weinberger, and had failed to follow the directions. Dkt. 376 at 62, 65. The Court imposed 12 months' imprisonment with a year of supervised release to follow the period of incarceration on the same terms and conditions that had been imposed previously. Dkt. 376 at 68.

## H. Sentencing Remand and Release from Custody

Ivers appealed his sentence, not based on any challenge to the underlying violations, but on grounds related to the adequacy of his representation and his waiver of counsel. On August 10, 2022, the Court of Appeals reversed on grounds related to Ivers' waiver of counsel and remanded for further proceedings. *United States v. Ivers*, 44 F.4th 753 (8th Cir. 2022). At the time of this decision, Ivers was incarcerated at FDC SeaTac in Washington. He was transported to Minnesota for the re-litigation of his third supervised release violation. Dkt. 395. During the transport process, Bureau of Prisons officers were notified that Ivers had a large amount of papers that he wished to take with him. Upon reviewing the items, officers found approximately 100 pages of drawings, writings, and

 

11

clippings from books/newspapers which focused on killing and murdering federal officials, mostly judges. *See* Dkt. 395, Gov't Ex. 1.

Given the highly disturbing nature of the documents, the Bureau of Prisons immediately notified the Marshals Service, who in turn notified other people associated with Ivers's case, including Officer Weinberger.

On November 17, 2022, Ivers admitted to violating his supervised release by having inappropriate contact with his probation officer, Jim Weinberger. The basis of the admission was the voicemail, transcribed above, left for Officer Weinberger on September 9, 2021. Dkt. 425 at 17-18. The Court imposed a 12-month sentence of incarceration, followed by one year of supervised release with added conditions including GPS (ankle) monitoring. *Id.* at 36-38. As Ivers had credit for the 12 months, he was scheduled to be released from custody and placed on a bus to North Dakota to live with his sister in West Fargo. *Id.* at 38-39.

## I. The Instant Offense and Anticipated Testimony

During the process of being released from custody, Ivers met with two United States Probation Officers in their office located in the Minneapolis Federal Courthouse. During that meeting, the officers explained the conditions of release to Ivers and fit him for the GPS bracelet. In a subsequent supervised release violation petition, the officers stated that Ivers became agitated during this meeting, yelling and swearing about the conditions of his release. Dkt. 393. Despite being told to calm down, Ivers continued to physically lash out

by waving his fists and slamming furniture, even breaking a chair. Court Security Officers and United States Marshals quickly responded and observed this behavior.

As Ivers left the probation office, he saw Officer Weinberger standing in the hallway. Ivers walked past Officer Weinberger, displayed both of his middle fingers to Officer Weinberger and screamed, "Fuck you!" once or twice. Ivers then circled back, approached Officer Weinberger a second time, backed him against the wall, and within a few feet of his face, yelled, "I'm going to get some fucking n****** to fucking kill you!" Ivers continued to yell the word "hate" as US Marshals escorted him out of the probation office. Noting the long history of issues on supervision, as well as the recent escalation in violence by Ivers, Officer Weinberger stated that Ivers's behavior and threats on November 17, 2022, made him fearful for his own safety as well as the safety of his fellow probation officers.

## IV. Evidentiary Issues

### A. The Use of a Racial Epithet

This case involves a specific threat made against Probation Officer Jim Weinberger on November 17, 2022. Due to the location of this incident, it was not recorded on video or audio. However, because of Ivers's behavior leading up to the threat, approximately a dozen people heard the threat. Every witness to this crime reports that they heard Ivers use a racial epithet. The government therefore anticipates that each witness will ultimately have to testify as to what they heard on November 17, 2022. The nature of the words spoken by Ivers are incredibly offensive. Neither the government nor its witnesses are comfortable using the racial epithet used by Ivers. Therefore, the government will plan to

13

use the term "racial epithet" or "the n-word" in lieu of the word spoken by Ivers. To the extent that other profane statements are an issue in this case, the government does not intend to sensor those unless otherwise directed by the Court.

### B. Intrinsic Evidence and 404(b) Evidence

As discussed above, this case involves approximately five years of history between Ivers and the federal court system. The government intends to offer, in its case-and-chief, both intrinsic evidence and Federal Rule 404(b) evidence. The government has filed a separate motion and accompanying memorandum regarding the admissibility of this evidence.

### C. The Defendant's Out of Court Statements

At trial, the government intends to offer out-of-court statements made by Ivers to other witnesses and recorded on voicemail messages. To the extent that such statements are offered to prove the truth of the matter asserted, they are statements of a party opponent. Fed. R. Evid. 801(d)(2)(a). While Rule 801 permits the government to present these statements, Rules 801(c) and 802 prohibit the admission of an out-of-court statement, offered to prove the truth of the matter asserted, when offered by the party uttering the statement. *United States v. Hughes*, 535 F.3d 880, 882 (8th Cir. 2008) (self-serving statement of defendant not admissible as statement against interest or under residual hearsay exception). Therefore, the government requests that the Court order that Ivers not offer or reference his own hearsay statements at trial, either during cross-examination or during his case-in-chief.

### D. Mention of Potential Punishment or the Effects of Potential Punishment

The government moves to preclude Ivers or his counsel from making any reference to the potential punishment he might face if convicted or the effect that punishment may have on his physical person. There is a heightened reason for concern because during the last trial before this Court, Ivers testified and, in the presence of the jury, repeatedly stated he was "facing 15 years in prison." Dkt. 157 at 719. This testimony caused the Court to give a curative instruction to the jury prior to deliberation. The government has included its proposed language for such an instruction in its Proposed Jury Instructions.

The punishment attributable to an offense is irrelevant to the elements of the offense and does not have any bearing on whether the government has proven the case beyond a reasonable doubt. Therefore, such evidence is neither relevant nor admissible pursuant to Federal Rules of Evidence 401 and 402 and Ivers should be instructed not to comment on it to the jury.

### E. Commenting on the Absence of Witnesses

The government moves to preclude Ivers or his counsel from commenting on the government's decision to not call a specific witness. The government believes this motion is necessary based on the content of mailings sent by Ivers during the pendency of this case. "The well-settled rule is that drawing any inference from a party's failure to call a witness equally available to both sides is impermissible." *United States v. Iredia*, 866 F.2d 114, 118 (8th Cir. 1989). Every witness in this case is equally available to both parties. As discussed above, there were multiple probation officers, court security officers, and United States Marshals that heard the threats made by Ivers on November 17, 2022. The government does not intend to call every single person who was present when the threats

occurred. Such a presentation would cause undue delay and would be needlessly cumulative pursuant to Federal Rule of Evidence 403. Decisions about which witnesses to present are squarely within the government's discretion. *United States v. Williams*, 481 F.2d 735, 737 (8th Cir. 1973). Therefore, the government respectfully requests Ivers be specifically instructed on this issue and will request curative instructions, contained in the Proposed Jury Instructions, to the jury if such an Order is violated.

## **CONCLUSION**

The government respectfully requests the Court enter Orders consistent with the requests herein.

Dated: January 30, 2023

ANDREW M. LUGER
United States Attorney

*/s/ Allison K. Ethen*

BY: ANDREW R. WINTER
ALLISON K. ETHEN
Assistant U.S. Attorneys